DECISION. *Page 2 
{¶ 1} Defendant-appellant, Larry Smith, appeals a conviction for having a weapon while under a disability under R.C. 2923.13(A)(3). In his sole assignment of error, he contends that the trial court erred in overruling his motion to suppress evidence, specifically, a gun found in his apartment. He argues that the police obtained consent to search the apartment at gunpoint and, therefore, that the consent was not voluntary. This assignment of error is not well taken.
 {¶ 2} The record shows that Officer Dan McShane and Lieutenant Michael Fern responded to a report of shots being fired at the Bahama Terrace apartments. Both officers were working off-duty details for the owner of the apartment complex. The broadcast described the individual involved in the shooting as a "[m]ale black, approximately 5'8" to 5'10", long dreadlocks, a bright red T shirt and black shorts."
 {¶ 3} When Officer McShane arrived at the scene of the shooting, he saw a black pickup truck with bullet holes in it. The officers had received information that the shooter was in a particular building in an apartment at the top of the stairs. McShane went to the back of the building, while Fern remained in front. The front stairs of the building were covered in glass, and Fern could see an individual matching the description of the shooter enter the apartment.
 {¶ 4} Subsequently, McShane saw an individual who matched the description, but for the fact that he was shirtless, leave the apartment with a woman and come down the back stairway, headed toward the laundry room. He intercepted that person, later identified as Smith, and the woman in the laundry room. He and another officer patted them both down, separated them, and escorted them into the back parking lot. *Page 3 
 {¶ 5} When McShane asked Smith why he thought the police were there, he said that he had heard somebody shooting in the parking lot. When he saw the truck with the bullet holes, he became upset. He said, "Oh my God, they shot up my truck." Because he was so upset, they put him in the back of a police car.
 {¶ 6} The woman identified herself as Smith's fiancÉe. She told the officers that she lived with Smith and that Smith had a gun in the apartment, although she did not know where he kept it. She also told them that her brother, Wayne Allen, was in the apartment.
 {¶ 7} McShane and Fern left another officer to watch Smith and his fiancÉe. Then, they went, with their guns drawn, to the front door of Smith's apartment. The officers acted with "heightened awareness," because they knew that Allen and a gun were inside, but they did not know if anyone else was there. They knocked on the door and heard rustling and movement inside.
 {¶ 8} After a few minutes, Allen answered the door. When he saw the police officers, he attempted to slam the door closed. The officers, not knowing if he or another person inside the apartment was going to get the gun, forced the door open and told Allen to step outside. After he came out into the hallway, they patted him down.
 {¶ 9} McShane asked Allen if he wanted to remain in the hallway or step inside to talk about why the officers were knocking on the door. Allen opened the door wide and gestured for them to enter. As they walked through the door, McShane saw a red T-shirt, like the one mentioned in the original description of the shooter, on the couch. The officers explained that they were investigating the gunshots. According to McShane, Allen was uncooperative until that time, but once they explained why they had come to the apartment, he became much more cooperative, even polite. *Page 4 
 {¶ 10} McShane determined that Allen had been living in Smith's apartment for several months and that he kept his clothes there. He asked Allen for consent to search the apartment, and Allen agreed. McShane watched while Allen signed a written consent form.
 {¶ 11} While McShane was talking to Allen, Fern began a sweep of the apartment to make sure no one else was there and no weapon was ready at hand. Just as Allen signed the consent form, Fern discovered a gun in the living room. He found it in a holster on the couch with a round of ammunition in the chamber.
 {¶ 12} The officers secured the weapon. They went down to the police cruiser to speak to Smith. After they read him his rights, Smith said that the gun had belonged to his father and that he kept it for protection.
 {¶ 13} Warrantless seizures are unreasonable under the Fourth Amendment except for a few well-delineated exceptions.[1] One exception is a search conducted by consent.[2] Where the state relies upon consent to justify a warrantless search, it bears the burden to show that consent was freely and voluntarily given.[3] Whether consent was voluntary or was the product of duress or coercion is a question of fact a court must determine from the totality of the circumstances.[4]
But where a detention is unlawful, a court will presume that the consent is tainted and will hold it invalid unless the totality of the circumstances "clearly demonstrates that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave."[5] *Page 5 
 {¶ 14} Smith first argues that he had standing to contest the search even though police had obtained consent from Allen. We agree. Smith undoubtedly had an expectation of privacy in his own apartment even if he was not present during the search, and he had standing to raise Fourth Amendment issues related to the search.[6]
 {¶ 15} Smith also seems to be arguing that the police officers should have obtained his consent and should not have relied upon Allen's. But a co-inhabitant who shares, or who police reasonably believe shares, authority over a residence may consent to the search of the residence, without the presence or consent of another co-inhabitant.[7] The police officers in this case established that Allen lived at the residence, even if only temporarily, and he could, therefore, consent to the search, without Smith's presence.
 {¶ 16} Smith relies upon Georgia v. Randolph,[8] in which the United States Supreme Court held that a warrantless search of a residence, which was based on the defendant's wife's consent, was invalid as to the defendant, who was physically present at the time of the search and expressly refused to consent. But courts have not extendedRandolph to the situation where the co-inhabitant is not present, even if that co-inhabitant is in police custody.[9] "There is no indicationRandolph would extend to absent, but potentially reachable defendants, who, if reached, might refuse consent."[10]
 {¶ 17} Finally, Smith argues that Allen's consent to search the apartment was coerced because it was obtained at gunpoint. We disagree. First, we note that the officers' presence in the hallway leading to the apartment and the knock on the door did not *Page 6 
implicate the Fourth Amendment since no reasonable expectation of privacy in the hallway existed.[11]
 {¶ 18} The Fourth Amendment was implicated when the officers forced the door open and ordered Allen to step outside. Nevertheless, this seizure was justified by the exigent circumstances. The exigent-circumstances exception to the warrant requirement permits warrantless searches and seizures.[12] The scope of this exception is strictly circumscribed by the exigencies that justify the search or seizure, and the police "bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."[13] A warrantless search or seizure brought about by exigent circumstances must be "strictly circumscribed by the exigencies which justify its initiation."[14] But the risk of danger in the context of a search or seizure in the home or otherwise on an "adversary's turf" is greater than in an on-the-street encounter. Therefore, the officers may take reasonable steps to ensure their own safety.[15]
 {¶ 19} The officers in this case knew that shots had been fired, but had no idea who may have been in the apartment besides Allen or what they were doing. Under the circumstances, they were justified in approaching the apartment with their guns drawn for their own and others' safety.
 {¶ 20} After they knocked and announced their presence, they heard movement inside, but they had no way of knowing what was going on behind the closed door. Allen opened the door, saw the police, and tried to shut it. The officers were also justified in having Allen step into the hallway to make sure that he did not have access to the gun they *Page 7 
believed was inside the apartment and that he was not otherwise armed. Thus, Allen's initial seizure was lawful.
 {¶ 21} Further, the officers did not go into the apartment at that time, and thus their actions were "circumscribed by the exigencies of the situation." We also note that the exigent circumstances were not of their own making. They were responding to a report of shots being fired and were trying to resolve the situation for the safety of all involved.[16]
 {¶ 22} Allen invited the officers into the apartment, even though he was given the choice to discuss matters in the hallway. McShane testified that once the officers explained that they were investigating the gunshots, Allen became much more cooperative and gave them consent to search. Smith contends that Allen only gave consent "under the threat of lethal force."
 {¶ 23} The state argues that, as soon as the officers found out that Allen was not armed, they holstered their guns. The police officers did not testify about when they holstered their guns. But Allen's own testimony showed that he was not held at gunpoint when he let the officers in the apartment or when he gave consent to search.
 {¶ 24} Allen's testimony was contradictory. First, he testified that as he tried to shut the door, the police officers pushed their way in the apartment. But, he added that "They push me back and walk back in. There wasn't no force. Stepped back in. But right behind me. By that time they had put their guns up." When asked when they put their guns back in their holsters, he responded, "When they seen I didn't have nothing. When they seen I didn't have no guns." Counsel asked if the officers were in the apartment. He said, "No, they was still standing in the hall." Thus, evidence in the record showed that the *Page 8 
officers had holstered their guns when Allen let the officers in the apartment and gave them consent to search and, therefore, that his consent was voluntary.
 {¶ 25} In contending that consent was involuntary, Smith relies heavily on Allen's testimony. In a hearing on a motion to suppress, matters as to the credibility of a witness are for the trial court to decide.[17] The trier of fact may believe some, all or none of a witness's testimony.[18] In reviewing a ruling on a motion to suppress, this court accepts the trial court's findings of fact as true as long as competent, credible evidence supports them.[19]
 {¶ 26} Smith further contends that the search of the apartment was improper because the officers were already searching the apartment while the written consent form was being signed. The officers' testimony showed that Allen had already given his consent orally before the search began. No requirement exists that police obtain written consent before searching. Oral consent is sufficient.[20]
 {¶ 27} Further, even if the officers had not yet obtained consent to search and even if Allen had not voluntarily invited them into the apartment, they were justified in entering the apartment to conduct a limited protective sweep because they had a reasonable belief based on specific and articulable facts that they could be in danger.[21] While conducting that sweep, they saw the gun in plain view and could properly have seized it.[22] *Page 9 
 {¶ 28} We hold that the search of Smith's apartment and the seizure of the gun inside did not violate Smith's Fourth Amendment rights. The trial court did not err in overruling his motion to suppress. Consequently, we overrule his assignment of error and affirm the trial court's judgment.
Judgment affirmed.
HENDON, P.J., and CUNNINGHAM, J., concur.
[1] Katz v. United States (1967), 389 U.S. 347, 357, 88 S.Ct. 507;State v. Brewster, 1st Dist. Nos. C-030024 and C-030025, 2004-Ohio-2993, ¶ 19.
[2] Schneckloth v. Bustamonte (1973), 412 U.S. 218, 219,93 S.Ct. 2041; State v. Posey (1988), 40 Ohio St.3d 420, 427, 534 N.E.2d 61;Brewster, supra, at ¶ 21.
[3] Schneckloth, supra, at 222; State v. Riggins, 1st Dist. No. C-030626, 2004-Ohio-4247, ¶ 14.
[4] Schneckloth, supra, at 248-249; Riggins, supra, at ¶ 14.
[5] State v. Hollins (Mar. 30, 2001), 1st Dist. No. C-000344, citingState v. Robinette, 80 Ohio St.3d 234, 1997-Ohio-343, 685 N.E.2d 762, paragraph three of the syllabus.
[6] See Rawlings v. Kentucky (1980), 448 U.S. 98, 104-105,100 S.Ct. 2556; Rakas v. Illinois (1978), 439 U.S. 128, 133-134, 99 S.Ct. 421;State v. Dennis, 79 Ohio St.3d 421, 426, 1997-Ohio-372,683 N.E.2d 1096.
[7] Georgia v. Randolph (2006), 547 U.S. 103, 106, 126 S.Ct. 1515;State v. Broussard (July 17, 1998), 1st Dist. No. C-970600.
[8] (2006), 547 U.S. 103, 126 S.Ct. 1515.
[9] See United States v. Dimodica (C.A.7, 2006), 468 F.3d 495,499-500; United States v. McCurdy (D.Me.2007), 480 F. Supp.2d 380, fn. 9; United States v. Howard (C.A.6, 2007), 216 Fed. Appx. 463, 469;United States v. Young (May 9, 2006), N.D.W.Va. No. 5:05CR63-01-02
[10] McCurdy, supra, at, fn. 9.
[11] State v. Robinson (1995), 103 Ohio App.3d 490, 494,659 N.E.2d 1292.
[12] Welsh v. Wisconsin (1984), 466 U.S. 740, 748-749, 104 S.Ct. 2091;State v. Sheppard (2001), 144 Ohio App.3d 135, 140, 759 N.E.2d 823.
[13] Welsh, supra, at 750; Sheppard, supra, at 141.
[14] State v. Applegate, 68 Ohio St.3d 348, 350, 1994-Ohio-356,626 N.E.2d 942; Brewster, supra, at ¶ 28.
[15] Maryland v. Buie (1990), 494 U.S. 325, 333-334, 110 S.Ct. 1093;Brewster, supra, at ¶ 24.
[16] See Brewster, supra, at ¶ 29; Sheppard, supra, at 143-144.
[17] State v. Fanning (1982), 1 Ohio St.3d 19, 20, 437 N.E.2d 583;Brewster, supra, at ¶ 22.
[18] State v. Linson, 1st Dist. No. C-030299, 2004-Ohio-3750, ¶ 15.
[19] Sheppard, supra, at 140.
[20] See State v. Sutton, 7th Dist. No. 01-CA-181, 2002-Ohio-6901, ¶ 17-25; State v. Glenn (Oct. 20, 2000), 1st Dist. Nos. C-000206 and C-000210.
[21] Buie, supra, at 336-337; Brewster, supra, at ¶ 24-26.
[22] See Horton v. California (1990), 496 U.S. 128, 141-142, 11o S.Ct. 2301; State v. Buzzard, 112 Ohio St.3d 451, 2007-Ohio-373,860 N.E.2d 1006, ¶ 15-17. *Page 1