DECISION.
 I. Facts and Procedure {¶ 1} Following a jury trial, defendant-appellant, George Williams, was convicted of aggravated murder under R.C. 2903.01(B), aggravated robbery under R.C. 2911.01(A)(1), and having weapons while under a disability under R.C. 2923.13(A)(2). All three convictions had accompanying firearm specifications. Although the aggravated-murder charge was accompanied by a death specification, the jury did not impose the death penalty and instead sentenced Williams to life in prison without parole. Williams has filed a timely appeal from his convictions, and the state has filed a cross-appeal. We dismiss the state's cross-appeal and affirm the trial court's judgment.
 A. The Scene of the Crime {¶ 2} The record shows that, at approximately 10:30 p.m., Green Township Police Officer Scott Hamilton received a dispatch to investigate a "shots fired" complaint on Mimosa Avenue, a small dead-end street. Upon arriving, Hamilton saw a cab with its lights on and several people standing around it. When he went up to the cab, he found the driver, Timothy Deger, lying across the front seat. He also noticed an empty shell casing on the back floorboard. A life squad arrived and attempted to revive Deger, but he was already dead.
 {¶ 3} The police spoke to Dorothy Jackson, who resided on Mimosa. She stated that she was sitting on her front porch smoking a cigarette when she saw *Page 3 
Deger's cab coming down the street. She saw the cab stop at the end of the street near the "catwalk," a path between two houses that led to the next street over, LeMar. She heard what sounded like three firecrackers. Then, three people jumped out of the cab, laughing, and fled over the catwalk.
 {¶ 4} The police set up a perimeter to contain the three suspects seen fleeing from Deger's cab. Canine officer Phillip Bremer responded with his dog, Nero, to assist in tracking the suspects. Nero picked up the suspects' scents at the catwalk and led Bremer to the back of a townhouse at 1332 LeMar. Bremer followed Nero around the front of the townhouse, where the dog lost the scent. When he returned to the back of the townhouse, Bremer smelled bleach around the back porch.
 B. The Search of the Townhouse {¶ 5} Anitra Latham lived in the townhouse with her three-year-old daughter. The police obtained a warrant to search the residence. Inside, they found Latham and her daughter, as well as Williams, Andre Woodcock, Williams's cousin, and Mary Rosemond, Williams's sister.
 {¶ 6} Evidence technicians found a black .380 semi-automatic handgun, a magazine, and a loose round of ammunition submerged in the water of a toilet tank in a second-floor bathroom. On the left side of the lid to the toilet tank, they lifted a partial fingerprint that matched Williams's left thumb. They also seized a bottle of bleach, a black plastic bucket, and clothing from the washing machine. *Page 4 
 C. Forensic Evidence {¶ 7} Inside the cab, the police recovered two spent shell casings and a bullet. Ballistics tests showed that the casings and the bullet were fired from the handgun found in the toilet tank in the townhouse. A bullet fragment that the coroner found in Deger's pants was also fired from the same handgun.
 {¶ 8} The coroner testified that Deger had suffered a variety of gunshot wounds, which included seven or eight skin perforations. After examining the entrance and exit wounds, the coroner determined that Deger had suffered two to four gunshot wounds. One was a contact wound, meaning that the muzzle of the gun had been pressed against his skin. Deger also had another wound to the chest, which appeared to be from close contact with the gun. The coroner determined that one of the bullets traveled through Deger's chest cavity, perforated his aorta and lung, and then exited through the right side of his chest. That bullet killed him.
 D. Latham's Testimony {¶ 9} Latham testified that she had known Williams and Rosemond for several years. Rosemond had been staying with Latham in the townhouse for about a month before Deger's murder. She had met Woodcock once several years before.
 {¶ 10} On the night of the murder, Latham was home alone with her daughter and was expecting Rosemond to return home about 10:00 or 10:30 p.m. Rosemond did return at that time, but she later arrived with Williams and Woodcock. She was also out of breath.
 {¶ 11} Latham overheard a heated conversation between Williams and Woodcock. Williams accused Woodcock of not following their plan, saying that *Page 5 
when he put the gun to the cab driver's head, Woodcock was supposed to take the money. Latham confronted Woodcock about what she had heard. Williams told her that he had shot a cab driver in the leg and thigh. Williams said that the cab driver was trying to be "Superman" and to grab the gun that Williams had pointed at him.
 {¶ 12} Latham testified that Williams, Woodcock, and Rosemond had all changed their clothes and put them in the washing machine. After hearing on the news that the police were looking for the cab driver's assailants with dogs, Williams and Woodcock had poured bleach on the back porch and steps.
 {¶ 13} Latham also testified that, after she had spoken to police, Williams had called her and asked why she had told the police what he had said about shooting the cab driver in the leg. Latham told him that she did not say that to the police and hung up the phone. Later, she found in her bedroom some latex gloves and Rosemond's purse, which also contained latex gloves. She turned both over to the police.
 {¶ 14} Latham acknowledged that when she had first talked to the police, she had denied having any knowledge about the robbery. She also admitted to lying to detectives several times.
 E. Woodcock's Testimony {¶ 15} Andre Woodcock testified that he had known Williams his whole life. He described a series of robberies that he, Williams, and another person had committed four or five years earlier. He described how he and Williams had planned those robberies and how they had looked for "easy victims." In one robbery, they had snatched a woman's purse and split the money. In another, they had robbed the *Page 6 
owner of a Jeep Cherokee at gunpoint and stolen the Jeep because they needed a car. In a third, they had stolen a Toyota Camry while the driver, whom they had chosen because he was about 45 years old and alone, was talking on a cellular phone.
 {¶ 16} In the fourth, they saw that the victim, chosen because he was about 50 and alone, had money in his wallet as he paid for his gas at a gas station. The three followed him to his home. Williams, who had a weapon, threw him to the ground and took his money. Because the victim began to yell, Woodcock ran away. He asked Williams, "[W]hy did he slam him?" Williams said, "Man, that nothing. He all right." He and Woodcock had an argument about Woodcock running away and not staying to help him.
 {¶ 17} Woodcock testified that he and Williams had been arrested for those robberies. Both of them served four years in prison. Woodcock had gotten out of prison about two months before Deger's murder, and he had "hook[ed] back up" with Williams.
 {¶ 18} According to Woodcock, Williams had called him on the day of the murder, and the two had met at Williams's brother's house in Avondale. Later that day, Rosemond had come over and the three of them had planned to rob someone. First, they had planned to rob Rosemond's boyfriend. Williams was going to be the gunman, and Woodcock and Rosemond planned to steal his car. That plan was foiled when Rosemond's boyfriend did not appear after Rosemond had called him.
 {¶ 19} Next, they had planned to rob a bootleg cab driver. Again, Williams was to be the gunman. Woodcock was going to go through the victim's pockets, and Rosemond was going to be the lookout. But the bootleg cab driver they had called did not appear. *Page 7 
 {¶ 20} Finally, the three had decided to rob a commercial cab driver. The plan called for Rosemond to call for a ride. Once the driver responded, Rosemond was going to lead him to a destination and serve as a lookout while Williams and Woodcock robbed him.
 {¶ 21} Rosemond, identifying herself as "Keisha," called for a cab to take the three to Green Township, where Rosemond had been staying with Latham. The dispatcher for the cab company confirmed that the call on which Deger was dispatched came from a woman identifying herself as "Keisha." Williams carried a .380-caliber handgun. All three of them brought latex gloves because they did not want to leave any fingerprints behind.
 {¶ 22} When the cab driven by Deger arrived, all three climbed in the back seat. Rosemond directed him to go to Green Township and eventually to drive down Mimosa and stop at the end of the dead-end street. After he did so, Deger asked for the cab fare of $17.60. Williams asked Deger if he had change for a $50 bill, and Deger replied that he did not. Williams then pulled out his gun, pointed it at the back of Deger's head, and said, "[G]ive me your mother-fucking money."
 {¶ 23} Deger tried to reach for the gun, and both Williams and Rosemond told Deger to give them the money. When Deger again tried to reach for the gun, Williams shot him. After Woodcock and Rosemond jumped out of the cab, Woodcock heard another shot. All three then fled to Latham's apartment.
 {¶ 24} Woodcock stated that all three spent the night at Latham's townhouse. They washed their hands to remove any gunpowder residue, changed their clothes, and put bleach around the house to avoid being captured by the canine unit. Williams took the gun apart and hid it in the toilet tank. *Page 8 
 F. Williams's Statements {¶ 25} Originally, Detective Kenneth Schweinefus had interviewed Williams. Schweinefus began to read Williams his rights by using a standard form. Before he could finish reading, Williams requested an attorney. Schweinefus ceased questioning and left the room.
 {¶ 26} Detective Brian Pitchford of the Hamilton County Sheriff's Department interviewed Woodcock and Rosemond, who had named Williams as the shooter. When Pitchford brought a jail uniform into the interview room for Williams to change into before being transported to the jail, Williams told him that he wanted to speak to him. Pitchford asked him if he was referring to the murder, and Williams replied that he was. Pitchford told Williams several times that because he had requested an attorney, Pitchford could not speak to him unless he voluntarily waived his rights. Williams agreed to initiate a discussion.
 {¶ 27} Although Williams admitted that he, Rosemond, and Woodcock had ridden in Deger's cab from Avondale to Green Township, he initially denied knowing anything about the shooting. When Pitchford informed him that both Rosemond and Woodcock had said that he was the shooter, he said, "Bring them in front of me, and I'll tell you about the incident." When the police brought Woodcock into the room, Williams called him a "bitch" and a "fucking coney."
 {¶ 28} After this confrontation, Williams gave a taped statement to police. Pitchford advised him of his rights. Williams provided an account similar to Woodcock's but denied that Rosemond had known about the robbery and named Woodcock as the shooter. *Page 9 
 {¶ 29} After the interview was over, an evidence technician came in to take a DNA sample from Williams. Williams blurted out that he did not care "about that fucking cab driver." He added, "Live by the sword, die by the sword. I don't care about living or dying. I'll plead insanity. I did it before, when I did a robbery with `Dre. Alls you have to do is look at some pictures and puzzles, act or give them false information."
 {¶ 30} Detective Andrew Guy of the Hamilton County Sheriffs Office rode in the van that transported Williams, Rosemond, and Woodcock to the jail. Guy overheard Williams tell Rosemond and Woodcock that he could not believe that they had implicated him. Williams said that the police did not have anything on him and that if Rosemond and Woodcock had not implicated him and if they had let Williams's uncle pick them up, they never would have been caught. He also told them not to say anything else and to tell their attorneys that the police had forced them to make statements implicating Williams.
 {¶ 31} Williams also said that he was going to pretend that he was insane and to tell jail authorities that he was going to kill himself. He again stated that he was going to fabricate an insanity defense by failing to solve simple puzzles. He went on to say that he did not care that police had found the gun because it did not have any fingerprints on it. He bragged that he was going to get a paid attorney and beat the charges, but that Woodcock and Rosemond were going to be convicted because they had talked to the police.
 {¶ 32} Subsequently, Pitchford accompanied an evidence technician to the jail to get hair samples from Williams. At that time, Williams questioned Pitchford about why he was being charged with aggravated robbery and capital murder. After *Page 10 
receiving a response to the question, Williams stated, "How can it be a robbery when I didn't get anything?"
 II. Police Interrogation {¶ 33} Williams presents four assignments of error for review. In his first assignment of error, he contends that the trial court erred in overruling his motion to suppress his statements to the police. He argues that after he had requested an attorney, the police should have ceased all interrogation, and that Pitchford should not have badgered him to make a statement by repeatedly telling him that he had to waive his rights. This assignment of error is not well taken.
 {¶ 34} A suspect who "has expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversation with the police."[1] The police may not reinitiate an interrogation under the guise of a generalized discussion about the investigation.[2] The suspect himself must initiate dialogue with the authorities and must knowingly and voluntarily waive his right to counsel.[3]
 {¶ 35} The record shows that when Williams told Schweinefus that he wanted counsel, questioning ceased. When Pitchford went into the room later to give Williams a jail uniform, Pitchford did not interrogate him. Williams, without any prompting, specifically stated that he wanted to talk to him. Pitchford told him *Page 11 
several times that he could not speak to him unless he waived his rights, yet Williams persisted in expressing his willingness to talk. Pitchford was not badgering him. To the contrary, he was respecting Williams's rights by telling him that he could not talk to Williams unless Williams waived his rights.
 {¶ 36} Williams understood his right not to talk to police without a lawyer present and exercised that right when Schweinefus attempted to interview him. Later, when Williams stated he wanted to talk to Pitchford, Pitchford again advised him of his rights. Williams indicated that he understood his rights, but he refused to sign a waiver-of-rights form. Pitchford did not threaten or force Williams to make any statement. The record shows that Williams "evinced a willingness and a desire for a generalized discussion about the investigation."[4]
 {¶ 37} To a large extent, Williams is simply arguing that the police officers' testimony was not credible. In a hearing on a motion to suppress, matters as to the credibility of witnesses are for the trier of fact to decide. The trier of fact may believe some, all, or none of a witness's testimony.[5] In this case, competent, credible evidence supported the trial court's factual findings that Williams had initiated further conversation with the police, and that he had voluntarily waived his right to counsel. Therefore, we must accept those findings.[6] The trial court did not err in overruling Williams's motion to suppress, and we overrule his first assignment of error. *Page 12 
 III. Other-Acts Evidence/Harmless Error {¶ 38} In his second assignment of error, Williams states that the trial court erred by permitting "other acts" testimony into evidence. Specifically, he argues that the court should not have allowed Woodcock to testify about the other robberies that he and Williams had committed. He contends that these robberies were not similar to the offenses in this case and were presented solely to prove his propensity to commit criminal acts. This assignment of error is not well taken.
 {¶ 39} We need not definitively respond to Williams's arguments under this assignment of error. Even if the admission of the testimony was erroneous, no possibility existed that it contributed to his convictions. The testimony regarding the other robberies was a minimal part of the state's overall case, and the evidence against Williams, particularly his own statements, was otherwise overwhelming.[7] Under the circumstances, we hold that any error was harmless beyond a reasonable doubt.[8] Consequently, we overrule Williams's second assignment of error.
 IV. Weight and Sufficiency {¶ 40} In his third assignment of error, Williams contends that the evidence was insufficient to support his convictions and that the convictions were against the manifest weight of the evidence. This assignment of error is not well taken.
 {¶ 41} Williams was convicted of aggravated murder under R.C.2903.01(B), which provides that "[n]o person shall purposely cause the death of another * * * *Page 13 
while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery." He was also convicted of a capital specification to that count under R.C.2929.04(A)(7), but we need not discuss that specification since he did not receive the death penalty. Life in prison without parole is an appropriate sentence for someone convicted of aggravated murder without a capital specification.[9]
 {¶ 42} Williams was further convicted of aggravated robbery under R.C.2911.01(A)(1). That statute provides that "[n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it or use it[.]"
 {¶ 43} Finally, Williams was convicted of having weapons while under a disability under R.C. 2923.13(A)(2). That statute provides that "[u]nless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence."
 {¶ 44} All three of the convictions were accompanied by firearm specifications under R.C. 2941.145. Those specifications were that "the offender had a firearm on or about the offender's person or under the offender's control while *Page 14 
committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense[.]"
 {¶ 45} Williams argues that the state failed to prove that he was the shooter. He contends that the only evidence proving that he was the shooter was Latham's and Woodcock's testimony, which was not credible. We find no merit in this argument. First, Woodcock's testimony was generally consistent with Latham's testimony, as well as with the police officers' testimony, the physical evidence, and Williams's own statements. Second, matters as to the credibility of witnesses are for the jury to decide.[10] The jury was free to believe some, all, or none of any witness's testimony.[11]
 {¶ 46} Our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that the state had proved beyond a reasonable doubt all the elements of aggravated murder, aggravated robbery, having weapons while under a disability, and the accompanying firearm specifications. Therefore, the evidence was sufficient to support those convictions.[12]
 {¶ 47} Further, after reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse Williams's convictions and order a new trial. Therefore, his convictions were not *Page 15 
against the manifest weight of the evidence.[13] We overrule Williams's third assignment of error.
 V. Prosecutorial Misconduct/Mistrial {¶ 48} In this fourth assignment of error, Williams contends that the trial court erred in overruling his motions for a mistrial. The record shows that he moved for a mistrial three times due to alleged instances of prosecutorial misconduct, and that the trial court overruled all three motions. Williams argues that these three incidents, as well other instances of alleged prosecutorial misconduct, denied him a fair trial. This assignment of error is not well taken.
 {¶ 49} Prosecutors are normally entitled to wide latitude in their remarks.[14] The test for prosecutorial misconduct is (1) whether the remarks were improper, and (2) if so, whether the remarks affected the accused's substantial rights.[15] The conduct of the prosecuting attorney during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial.[16]
 {¶ 50} Further, the decision whether to grant a mistrial lies within the court's discretion. A trial court should not order a mistrial merely because an error or irregularity has occurred, unless it affects the defendant's substantial rights.[17]7 The court should declare a mistrial "only when the ends of justice so require and when a fair trial is no longer possible."[18] *Page 16 
 {¶ 51} Our review of the record shows that even if the prosecutor's conduct was improper, none of the instances of which Williams complains was so egregious as to affect his substantial rights or to deny him a fair trial. Overall, they were minor incidents in the conduct of the entire trial.
 {¶ 52} Further, none of these instances required the trial court to take the drastic step of declaring a mistrial. The trial court's decision to overrule William's three motions for a mistrial was not so arbitrary, unreasonable, or unconscionable as to connote an abuse of discretion.[19] Consequently, we overrule Williams's fourth assignment of error and affirm his convictions.
 VI. The State's Cross-Appeal {¶ 53} The state has taken the unusual step of filing a cross-appeal. In its sole assignment of error, it challenges the trial court's decision to exclude evidence during the penalty phase. Specifically, it argues that the trial court erred when it prohibited the prosecutor from cross-examining the defense's mitigation expert on the contents of the records the expert had used to determine that Williams was an individual who suffered intellectual and developmental deficiencies. Though there appears to be merit to the state's contention on cross-appeal, we are precluded by statute from addressing this assignment of error.
 {¶ 54} The state may appeal in a criminal case only when a statute confers express authority.[20] R.C. 2945.67(A) sets forth the circumstances under which the *Page 17 
state may appeal.[21] The statute provides that a prosecuting attorney may appeal as a matter of right certain trial court decisions, none of which applies in this case. It also states that a prosecuting attorney "may appeal, in accordance with section 2953.08 of the Revised Code, a sentence imposed upon a person who is convicted of or pleads guilty to a felony." This provision does not apply because R.C. 2953.08(D)(1)(3) specifically provides that "[a] sentence imposed for aggravated murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review under this section."
 {¶ 55} R.C. 2945.67 goes on to state that the prosecuting attorney "may appeal by leave of court to which the appeal is taken any other decision, except the final verdict, of the trial court in a criminal case or of the juvenile court in a delinquency case." If the state seeks to appeal by leave of court, it must follow the provisions of App.R. 5(C), which requires, among other things, that the state file a motion for leave to appeal concurrently with the notice of appeal. The record does not reflect the filing of a motion for leave to appeal. Without such a filing, this court lacks jurisdiction to hear the cross-appeal. Consequently, we have no choice but to dismiss the state's cross-appeal.[22]
Judgment affirmed and cross-appeal dismissed.
HILDEBRANDT, P.J., and CUNNINGHAM, J., concur.
[1] Arizona v. Roberson (1988), 486 U.S. 675, 677, 108 S.Ct. 2093, quoting Edwards v. Arizona (1981), 451 U.S. 477, 484-485,101 S.Ct. 1880.
[2] State v. Van Hook (1988), 39 Ohio St.3d 256, 259,530 N.E.2d 883.
[3] Oregon v. Bradshaw (1983), 462 U.S. 1039, 1045-46, 103 S.Ct. 2830;Van Hook, supra, at 259; State v. Jones (Aug. 28, 1998), 1st Dist. No. C-970043, affirmed in 90 Ohio St.3d 403, 2000-Ohio-187,739 N.E.2d 300.
[4] Bradshaw, supra, at 1045-1046; State v. Jackson (1991),57 Ohio St.3d 29, 35, 565 N.E.2d 549; Jones, supra.
[5] State v. Fanning (1982), 1 Ohio St.3d 19, 20, 437 N.E.2d 583;State v. Smith, 1st Dist. No. C-061032, 2007-Ohio-3786, ¶ 25.
[6] See Jackson, supra, at 35; Smith, supra, at ¶ 25.
[7] See State v. Williams (1983), 6 Ohio St.3d 281, 452 N.E.2d 1323, paragraph six of the syllabus; State v. Wilson, 1st Dist. No. C-000670, 2002-Ohio-1854.
[8] State v. Bayless (1976), 48 Ohio St.2d 73, 357 N.E.2d 1035, paragraph seven of the syllabus, vacated as to death penalty (1978),438 U.S. 911, 98 S.Ct. 3135; State v. Brundage, 1st Dist. No. C-030632,2004-Ohio-6436, ¶ 33.
[9] R.C. 2929.02(A) and 2929.03(A)(1)(a).
[10] State v. Bryan, 101 Ohio St.3d 272, 2004-Ohio-971,804 N.E.2d 433, ¶ 116; State v. Russ, 1st Dist. No. C-050797, 2006-Ohio-6824, ¶ 23.
[11] State v. Linson, 1st Dist. No. C-030299, 2004-Ohio-3750, ¶ 15.
[12] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus; Russ, supra, at ¶ 13; State v.Spence, 10th Dist. No. 05AP-891, 2006-Ohio-6257, ¶ 33-41; State v.Jordan, 167 Ohio App.3d 157, 2006-Ohio-2759, 854 N.E.2d 520, ¶ 48-51;State v. McKibbon, 1st Dist. No. C-010145, 2002-Ohio-2041.
[13] See State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541; Russ, supra, at ¶ 22-23; Jordan, supra, at ¶ 49-53.
[14] State v. Mason, 82 Ohio St.3d 144, 162, 1998-Ohio-370,694 N.E.2d 932; State v. Hirsch (1998), 129 Ohio App.3d 294, 309,717 N.E.2d 789.
[15] State v. Lott (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293;Hirsch, supra, at 309.
[16] State v. Keenan (1993), 66 Ohio St.3d 402, 405, 513 N.E.2d 203;State v. Matthews, 1st Dist. Nos. C-060669 and C-060692, 2007-Ohio-4881, ¶ 19.
[17] State v. Sage (1987), 31 Ohio St.3d 173, 182, 510 N.E.2d 343;Matthews, supra, at ¶ 17.
[18] State v. Brewster, 1st Dist. Nos. C-030024 and C-030025,2004-Ohio-2993, ¶ 67, quoting State v. Broe, 1st Dist. No. C-020521, 2003-Ohio-3054, ¶ 36.
[19] See State v. Clark, 71 Ohio St.3d 466, 470, 1994-Ohio-43,644 N.E.2d 331; Matthews, supra, at ¶ 18.
[20] State ex rel. Leis v. Kraft (1984), 10 Ohio St.3d 34, 35,460 N.E.2d 1372; State v. Gross, 1st Dist. Nos. C-040196 and C-040208,2004-Ohio-6997, ¶ 19.
[21] Id. at ¶ 20; State v. Williams (1993), 85 Ohio App.3d 542, 544,620 N.E.2d 171.
[22] In re TA., 10th Dist. No. 07AP-327, 2007-Ohio-4417, ¶ 11;State v. Mitchell, 6th Dist. No. L-03-1270, 2004-Ohio-2460; State v.Sanders (Nov. 30, 1994), 2nd Dist. No. 94-CA-48; Williams, supra, at 546. *Page 1