[Cite as *State v. McConnaughey*, 2021-Ohio-3320.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-200273 |
| | | C-200274 |
| Plaintiff-Appellee, | : | TRIAL NOS. 19CRB-31080A, B |
| vs. | : | |
| | | *O P I N I O N.* |
| PHILLIP MCCONNAUGHEY, | : | |
| Defendant-Appellant. | : | |


Criminal Appeals From:  Hamilton County Municipal Court

Judgments Appealed From Are:  Affirmed

Date of Judgment Entry on Appeal:  September 22, 2021


*Andrew Garth*, City Solicitor, *William T. Horsley*, Chief Prosecuting Attorney, and *Jon Vogt*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Lora Peters*, Assistant Public Defender, for Defendant-Appellant.

**WINKLER, Judge**.

{¶1}   Following a jury trial, defendant-appellant Phillip McConnaughey was convicted of aggravated menacing under R.C. 2903.21(A) and menacing under R.C. 2903.22(A).   He now appeals, setting forth four assignments of error.   We find no merit in his four assignments of error, and we affirm his convictions.

## I.  Factual Background

{¶2}   The record shows that on December 28, 2019, Calonda Balleau, a realtor for Sibcy Cline, arrived at a property for sale on River Road.   Balleau testified that she was dressed professionally in black pants and a blue blouse, and that there was a for-sale sign in the yard.   Parking was not allowed on the street, so Balleau parked in the driveway, but she could not pull down very far due to a crumbling retaining wall.

{¶3}   Her client, Carlos Velasquez, who was interested in buying the house as an investment property, arrived a short time later to look at the house.   He parked his truck in front of McConnaughey's property, which was next door to the property for sale.

{¶4}   Balleau and Velasquez went inside the house and toured the property and discussed various maintenance issues.   They came out after about five minutes.   While Balleau was securing the house and replacing the key in the lockbox, Velasquez went to look at the foundation on the side of the house away from McConnaughey's property.

{¶5}   Then McConnaughey appeared on the steps of his house and yelled for them to get out of there.   Balleau testified that she told him that she was a realtor, she had just finished showing the house and that they were leaving.  McConnaughey started to cross his yard and yelled, "Get out of here, you nigger" and "go back to

your own country." As she and Velasquez were trying to leave, he rushed at them, yelling "I'll kill you, you nigger bitch. Go back to your Section 8." Balleau stated, "And I was just trying to sell a home. * * * I wasn't ready for that. I never encountered anything like that. I wasn't prepared for that at all."

{¶6} When Velasquez appeared and came down the steps, Balleau was still in the yard. She told McConnaughey she would call the police. Then McConnaughey said he would also call the police, and he called her a "snitch." Balleau testified that as Velasquez came down the stairs, McConnaughey rushed him, and said, "I'll crack your head boy," and called him "all kinds of boys." She stated that Velasquez "had to stay right where he was, because if he made a step, then McConnaughey would charge again. So he just froze." Balleau stated that she was trying to get to her car, but that McConnaughey "wasn't letting [her] move," so she called 911.

{¶7} McConnaughey remained standing at the retaining wall while Balleau called 911. A recording of the 911 call showed that she did not tell the operator that McConnaughey had threatened to kill her or that she could not get to her car. She described McConnaughey as being in his thirties or forties, and that he had a "low IQ."

{¶8} After the 911 call had ended, Balleau pretended she was still on the call so McConnaughey would think she was talking to the police. Eventually McConnaughey took a couple of steps back, and she was able to get to her car, where she waited for police on the advice of the 911 operator. She said that Velasquez "made it" to his truck and moved it forward, but he found out he was in a "bus zone." He then went across the street, but it was a private lot. He told Balleau he would drive to a convenience store nearby, but remained in communication with her.

{¶9} Balleau said that it took about 20 minutes for the police to arrive. The officers said that she was standing outside her car when they arrived. She told the responding officers that she had been showing the for-sale property to her client

3

when McConnaughey had told them to leave, used racial slurs, and tried to attack them. She also said that he had said that he would bash Velasquez's head in and kill him.

{¶10} Balleau testified that when McConnaughey stated that he would kill her, it made her angry. But it also made her fearful because of "the look in his eyes and the way he was just reacting." She felt that McConnaughey was going to cause her serious physical harm because of "his whole demeanor, the way he was acting, the rage that he was demonstrating and the words" he was using. She added, "So yes, I did think that, because if you would have seen the look in his eyes, * * * it was very apparent that he meant business. He wanted us to leave, but he was not allowing us to leave." She said that she just wanted to get away from McConnaughey.

{¶11} Velasquez testified that after he and Balleau had looked at the house, he went to the side of the house to look at the foundation. When he came back to the front of the house, he was surprised to hear a man he identified as McConnaughey calling Balleau names and telling her to leave. McConnaughey was pointing at Velasquez's truck and yelling. He heard McConnaughey say to Balleau "I'm going to kill you, nigger."

{¶12} Velasquez walked down to where Balleau's car was parked and stood in front of her. He said to McConnaughey, "well, you are not going to do that, * * * I'm going to move my truck and we good." But McConnaughey continued to yell and continued moving closer to them. Velasquez then told him, "if you come here, I have to protect her, because you're not going to harm her in front of me." McConnaughey then called him a "fucking Latino" and told him, "I'm gonna crack your head on the concrete."

{¶13} Velasquez said that he was "kind of" in shock, because he didn't know why McConnaughey was attacking them. When asked if he thought McConnaughey would follow through on his threat, Velasquez said "Well, he seems very upset * * *

4

and * * * he seems like he's going to hurt us." He had that feeling because of "[h]is look in his eyes, the way he was acting. He was acting like he's going to jump the retaining wall."

{¶14} Velasquez said that as McConnaughey was making the threats, he walked back and forth on the retaining wall. When asked if he thought he and Balleau could get to their vehicles, he said, "Not sure. * * * I wasn't sure of anything. * * * I thought he was going to do something to us." He further stated that he felt that McConnaughey was going to harm him and Balleau, and he described the situation as "dangerous."

{¶15} While Balleau was on the phone with the 911 operator, McConnaughey went back to the porch of his house and Velasquez was able to get to his truck. He moved it forward, but then realized he was parked at a bus stop. He was going to park across the street but he discovered that he would be on private property. He then drove down the street to a nearby convenience store. He did not feel comfortable leaving Balleau at the scene, but he thought moving his truck might calm the situation. As he was driving, he saw police vehicles heading in the direction of the house. He called Balleau to tell her that the police were close to her.

{¶16} On cross-examination, when Velasquez was asked if he was afraid of McConnaughey, he said no. He later clarified that he still felt that he and Balleau were in a dangerous situation. He also admitted that the path he took to his truck took him closer to McConnaughey. But he said that he did not actually get close to him. He denied that he ever motioned for McConnaughey to fight him. He testified that he told the police that McConnaughey had threatened to kill Balleau. But the video from the officers' body cameras showed that he used the word "beat."

{¶17} Cincinnati Police Officer Andrew Yenco testified about his observations when he arrived at the scene. He described Balleau as "shaky, a little scared, a little panicked" when he and the other officer got there, but he said that she

5

did calm down a little. The officers interviewed Balleau and Velasquez separately. He and the other officer determined that they were going to arrest McConnaughey for aggravated menacing as to Balleau and menacing as to Velasquez.

{¶18} Officer Yenco identified state's exhibit three, which was admitted into evidence over McConnaughey's objection. The exhibit consisted of three videos from his body camera that contained his interviews with Balleau and Velasquez. He said that they were fair and accurate representations of his conversations with them.

{¶19} He acknowledged that the video showed Balleau had told him that McConnaughey had threatened them, but she did not specify the words he had used. He also acknowledged that in the video, Velasquez had never specifically said that McConnaughey had threatened to kill anyone. The officer also said that McConnaughey had been cooperative, that he had denied threatening to kill anyone, and that he was concerned about drug activity at the vacant house.

{¶20} Officer Terrill Saylor testified that he had primarily interviewed Balleau at the scene. He identified the video from his body camera, which was admitted into evidence as state's exhibit four over McConnaughey's objection. Officer Saylor said that the video was a fair and accurate representation of his conversation with Balleau. He said that in the video, Balleau had reported to him that McConnaughey had threatened to kill her and Velasquez. After viewing Officer Yenco's body camera footage, he acknowledged that Velasquez had not used the word "kill."

{¶21} After hearing the evidence, the jury found McConnaughey guilty of aggravated menacing against Balleau and menacing against Velasquez. He was later sentenced, and this appeal followed.

### II. Separation of Witnesses

**{¶22}** In his first assignment of error, McConnaughey contends that the trial court erred in denying his motion for a separation of witnesses. He argues that the trial court abused its discretion by arbitrarily denying his motion and allowing the two victims to remain in the courtroom. This assignment of error is not well taken.

**{¶23}** Evid.R. 615(A) provides that "at the request of a party, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses * * *." But Evid.R. 615(B)(4) states that a victim of a charged offense may not be excluded "to the extent that the alleged victim's presence is authorized" by statute or the Ohio Constitution.

**{¶24}** The amendment to the Ohio Constitution known as Marsy's Law became effective on February 5, 2018. It expands the rights afforded to victims of crime. *Cleveland v. Alrefaei*, 2020-Ohio-5009, 161 N.E.3d 53, ¶ 56 (8th Dist.). Article I, Section 10a(A)(2) of the Ohio Constitution specifically provides that the victim has a right to be present at "all public proceedings involving the criminal offense * * * against the victim."

**{¶25}** While Marsy's Law now incorporates the victim's right to be present into the Ohio Constitution, "the notion that a victim may remain present during trial proceedings is not new." *Alrefaei* at ¶ 57. R.C. 2930.09 also provides for the victim's presence in the courtroom at any stage of the proceedings unless exclusion is required to ensure a fair trial. *Alrefaei* at ¶ 59; *State v. Montgomery*, 5th Dist. Stark No. 2019CA00012, 2019-Ohio-5178, ¶ 20; *State v. Maley*, 1st Dist. Hamilton No. C-120599, 2013-Ohio-3452, ¶ 5. The statute requires the trial court to carefully balance the defendant's right to a fair trial against the victim's constitutional and statutory right to be present during criminal proceedings. *Alrefaei* at ¶ 62.

{¶26} Generally, a decision to allow a victim to remain in the courtroom during a trial is left to the discretion of the trial court. The burden is on the defendant to show that the alleged victim's presence compromised the defendant's right to a fair trial. *Alrefaei* at ¶ 60; *Montgomery* at ¶ 21.

{¶27} In this case, when McConnaughey requested a separation of witnesses, the trial court summarily responded, "The victims can be present." When defense counsel attempted to make a record of her objection, the trial court interrupted, stating again, "Victims can be present." The court added that McConnaughey could cross-examine the victims. While the trial court should have allowed McConnaughey's counsel to put her objection on the record, nothing in the record shows that the trial court failed to consider McConnaughey's right to a fair trial.

{¶28} Further, even if we were to hold that the trial court erred, any error was harmless because McConnaughey has failed to show that he was prejudiced by the failure to separate the witnesses. *See Alrefaei*, 2020-Ohio-5009, 161 N.E.3d 53, at ¶ 64. He makes only general assertions that having the victims present to listen to each other's testimony allowed for the possibility of an unfair trial. He also contends that Velasquez's testimony was inconsistent with what he told the police as shown in the video and that after hearing Balleau's testimony, he "conveniently echoed" her testimony, which is purely speculative.

{¶29} This court has stated that "for a defendant to show that a victim's presence would result in an unfair trial, [the defendant] must present particularized evidence that the victim's testimony will be so affected by the victim's presence during the testimony of the other witnesses that [the defendant's] right to a fair trial would be violated. General assertions that it is possible are insufficient." *Maley*, 1st Dist. Hamilton No. C-120599, 2013-Ohio-3452, at ¶ 7. *Accord Alrefaei* at ¶ 63; *Montgomery*, 5th Dist. Stark No. 2019CA00012, 2019-Ohio-5178, at ¶ 22-23.

8

{¶30} The victims' testimony was not so dramatically different than their statements to police so as to deny McConnaughey a fair trial. Further, defense counsel thoroughly cross-examined both the victims to test whether each victim's testimony was tailored or truthful. *See Alrefaei* at ¶ 64. McConnaughey has not demonstrated that the exclusion of the victims was necessary to protect his right to a fair trial. We cannot hold that the trial court's decision to allow them to remain in the courtroom was so arbitrary, unreasonable or unconscionable as to connote an abuse of discretion. *See State v. Clark*, 71 Ohio St.3d 466, 470, 644 N.E.2d 331 (1994); *State v. McDonald*, 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, ¶ 33. COnsequently, we overrule his first assignment of error.

### III. Prior Consistent Statements

{¶31} In his second assignment of error, McConnaughey contends that the trial court erred when it allowed exhibits three and four, the recordings of the police officers' body cameras, to be played for the jury as nonhearsay under Evid.R. 801(D)(1)(b). He argues that the rule does not apply because he did not make an allegation of recent fabrication against either victim. This assignment of error is not well taken.

{¶32} The decision whether to admit or exclude evidence lies within the trial court's discretion. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus; *State v. Williams*, 1st Dist. Hamilton No. C-180291, 2020-Ohio-1228, ¶ 32. An appellate court will not disturb a trial court's decision admitting or excluding evidence absent an abuse of discretion and a showing that the accused has suffered material prejudice. *State v Martin*, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985); *Williams* at ¶ 32.

{¶33} Evid.R. 801(D)(1)(b) provides that a statement is not hearsay if "[t]he declarant testifies at a trial or hearing and is subject to cross-examination concerning the statement, and that statement is * * * consistent with the declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive[.]" Ohio courts have interpreted this rule to include only those prior consistent statements that have been made before prior inconsistent statements or before any motive to falsify testimony. *State v. Jones*, 1st Dist. Hamilton No. C-080518, 2009-Ohio-4190, ¶ 35. In determining whether to admit a prior consistent statement, a trial court should take a generous view of the entire trial setting to determine if there was sufficient impeachment to amount to a charge of fabrication or improper influence or motive. *State v. Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, ¶ 14 (1st Dist.); *Jones* at ¶ 35.

{¶34} Further, the proponent of the statement need not show both improper motive and recent fabrication. Evid.R. 801(D)(1)(b) provides for the admissibility of a prior consistent statement upon a showing of either circumstance. *State v. Maddox*, 1st Dist. Hamilton Nos. C-070482 and C-070483, 2008-Ohio-3477, ¶ 22.

{¶35} McConnaughey argues that he never claimed that either victim's testimony was fabricated. He argued that the witnesses' testimony was inconsistent with their prior statements to the police and that he was highlighting the differences between the victims' trial testimony and their statements in the video. We disagree.

{¶36} In *State v. Brown*, 8th Dist. Cuyahoga No. 99024, 2013-Ohio-3134, defense counsel sought to impeach the victim's credibility with questions referring to portions of her police statements and implying that she had fabricated relatively

10

minor details of her in-court testimony because she had not included those details in her statement to police. On redirect, the prosecutor elicited the circumstances in which the statement was made and asked the victim to read her written statement to the police. The court stated that, "This was proper, since on cross-examination an implication of fabrication and improper motive was made, which is the basis for admitting such statements under Evid.R. 801(D)(1)(b)." *Id.* at ¶ 51. *See State v. Brady*, 3d Dist. Marion No. 9-03-27, 2003-Ohio-6005, ¶ 14-15.

{¶37} Both of the victims were thoroughly cross-examined as to why the details of their testimony about McConnaughy's threats had not been previously relayed to the police officers. The clear implication of McConnaughey's trial strategy was to show that the victims were embellishing their testimony. Defense counsel asserted in opening statements that the victims had both changed their stories over time. Counsel's questions were intended to implicitly and sometimes explicitly charge that the victims' versions of events were of recent fabrication. In fact, defense counsel even asked Balleau if she understood that she was testifying under oath, which implied that she had been lying.

{¶38} Therefore, sufficient impeachment occurred to amount to a charge of recent fabrication at trial, and the trial court did not abuse its discretion in admitting the video from the police officers' body cameras into evidence. We overrule McConnaughey's second assignment of error.

### IV. Manifest Weight

{¶39} In his third assignment of error, McConnaughey contends that his convictions were against the manifest weight of the evidence. He argues that the

state failed to prove the elements of aggravated menacing and menacing beyond a reasonable doubt. This assignment of error is not well taken.

{¶40} McConnaughey was convicted of aggravated menacing under R.C. 2903.21(A), which provides, "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family." He was also convicted of menacing under R.C. 2903.22(A), which provides, "No person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family." The sole difference between the offenses is the degree of harm threatened. *State v. Cruzbaez*, 1st Dist. Hamilton No. C-180263, 2019-Ohio-2452, ¶ 24.

{¶41} To prove the elements of aggravated menacing, the state must show that the victim had a subjective belief of fear of serious physical harm. *Cruzbaez* at ¶ 16; *State v. Landrum*, 1st Dist. Hamilton No. C-150718, 2016-Ohio-5666, ¶ 9. Similarly, to prove the elements of menacing, the state must show that the victim had a subjective belief of fear of physical harm. *State v. Lampela*, 2016-Ohio-8007, 67 N.E.3d 836, ¶ 19 (6th Dist.); *State v. Cox*, 5th Dist. Stark No. 2015CA00174, 2016-Ohio-3250, ¶ 22. Evidence of a person's belief can be proven with circumstantial evidence. *Landrum* at ¶ 9.

{¶42} McConnaughey argues that the evidence when taken as a whole shows that the victims' testimony that they feared serious physical harm or physical harm was not credible. He points out various minor inconsistencies between the victims' testimony and their previous statements to the 911 operator and to police. But the jury believed the victims' testimony. The trier of fact may believe all, some or none of any witness's testimony. *State v. Williams*, 1st Dist. Hamilton Nos. C-060631 and C-060668, 2007-Ohio-5577, ¶ 37. Matters as to the credibility of evidence are for the

12

trier of fact to decide because the trier of fact sees the witnesses in person and is in a better position to weigh the witnesses' demeanor and credibility. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 116; *Cruzbaez* at ¶ 22-23.

**{¶43}** After reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse the convictions and order a new trial. Therefore, the convictions are not against the manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *Cruzbaez*, 1st Dist. Hamilton No. C-180263, 2019-Ohio-2452, at ¶ 21. Therefore, we overrule McConnaughey's third assignment of error.

### *V. Allocution*

**{¶44}** In his fourth assignment of error, McConnaughey contends that he was denied the right to allocution under Crim.R. 32. He argues that the trial court failed to address him and inquire whether he would like to make a statement on his own behalf or present any information in mitigation of his punishment. This assignment of error is not well taken.

**{¶45}** Crim.R. 32(A) provides that at the time of imposing sentence, the court shall "[a]fford counsel an opportunity to speak on behalf of the defendant and address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment." The right of allocution belongs to the defendant himself. *State v. Greenway*, 1st Dist. Hamilton No. C-160511, 2017-Ohio-7729, ¶ 21; *State v. Osume*, 1st Dist. Hamilton No. C-140390, 2015-Ohio-3850, ¶ 23. The failure to afford a defendant the right of allocution is not insignificant. *Greenway* at ¶ 21; *State v. Long*, 1st Dist. Hamilton No. C-150713, 2016-Ohio-5345, ¶ 3. "A Crim.R. 32 inquiry is much more than an empty ritual: it represents a defendant's last opportunity to plead his case or express

remorse." *State v. Green*, 90 Ohio St.3d 352, 359-360, 738 N.E.2d 1208 (2000). It is not enough for the trial court to simply give defense counsel the opportunity to speak on the defendant's behalf. *Greenway* at ¶ 21; *Osume* at ¶ 23.

**{¶46}** Trial courts must "painstakingly adhere to Crim.R. 32, guaranteeing the right of allocution." *Green* at 359; *Long* at ¶ 4. If a trial court imposes sentence without first asking the defendant if he or she wants to exercise the right of allocution, resentencing is required unless the error is invited or harmless error. *State v. Campbell*, 90 Ohio St.3d 320, 738 N.E.2d 1178 (2000), paragraph three of the syllabus; *Long* at ¶ 4. An error will be deemed harmless only in unusual circumstances. *See State v. Matthews*, 1st Dist. Hamilton No. C-140663, 2015-Ohio-5075, ¶ 14; *Osume* at ¶ 24.

**{¶47}** The doctrine of invited error holds that a litigant may not "take advantage of an error which he himself invited or induced." *Campbell* at 324, quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus. The record must affirmatively demonstrate that defense counsel induced or was actively responsible for the trial court's error. Defense counsel must suggest, request or actively consent to the improper procedure. *Campbell* at 324; *State v. Thomas*, 11th Dist. Lake No. 2019-L-085, 2020-Ohio-4635, ¶ 98, *reversed on other grounds*, 161 Ohio St.3d 1450, 2021-Ohio-534, 163 N.E.3d 596.

**{¶48}** At the sentencing hearing, the trial court told McConnaughey, "I want you to apologize to [Ballou]." McConnaughey said that he was sorry. The court then said, "That's not real." McConnaughey again said that he was sorry, to which the court responded, "If you don't have genuine remorse, I'll take that into account. If you don't have genuine remorse for this thuggish behavior –." McConnaughey again said that he was sorry. Then defense counsel said, "Your Honor, I have asked my client not to speak." The court stated, "Don't say a thing." The trial court further

14

commented about how he didn't believe that the apology was sincere. Counsel then added, "But I would just remind the Court that I did ask him not to speak." Defense counsel spoke on McConnaughey's behalf as did one of his coworkers. Then, the court asked, "Anything else, Counsel?" and counsel replied "No."

{¶49} While the trial court did not specifically address McConnaughey personally, defense counsel expressly told the trial court that she had advised him not to speak. "There are many reasons why counsel may have so advised appellant, not the least of which would be preventing appellant from saying something inculpatory that might be used against him and potentially jeopardize his appeal." *Thomas* at ¶ 99.

{¶50} Any error by the court in failing to address McConnaughey was due to counsel's "affirmative and explicit representation" that she had advised him not to speak. *See id.* Therefore any error was invited error, and we overrule his fourth assignment of error.

{¶51} In sum, we find no merit in McConnaughey's four assignments of error. Consequently, we overrule them and affirm the trial court's judgments.

Judgments affirmed.

**ZAYAS, P.J.,** and **BERGERON, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.