[Cite as *State v. Szafranski*, 2025-Ohio-1104.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

| | |
|---|---|
| State of Ohio/City of Vermillion | Court of Appeals No.  E-24-020 |
| Appellee | Trial Court No.  CRB2300152 |
| v. | |
| David Szafranski | **DECISION AND JUDGMENT** |
| Appellant | Decided:  March 28, 2025 |
| [Ohioans for Concealed Carry, Inc. – Amicus Curiae] | |

* * * * *

Wayne R. Nichol and Sara Fagnilli, for Appellee.

Matthew M. Nee, for appellant.

Michael A. Truman and Derek A. DeBrosse,
for amicus curiae.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, David Szafranski, appeals the March 19, 2024 judgment of the Vermillion Municipal Court sentencing him for a misdemeanor conviction of menacing. Because appellee, the city of Vermillion, did not present sufficient evidence that the victim in this case had a subjective belief that Szafranski would cause him physical harm, we reverse.

## I. Background and Facts

{¶ 2} In July 2023, Szafranski was charged by complaint with one count of menacing in violation of R.C. 2903.22, a fourth-degree misdemeanor, following an altercation with the victim, J.W. The complaint alleged that Szafranski knowingly caused J.W. to believe that Szafranski "would cause physical harm to [J.W.'s] person or property . . . ."

{¶ 3} At Szafranski's jury trial the city presented the testimony of J.W. and Vermillion Police Department officers Emily Cobb and Benjamin Sargent. Szafranski testified in his own behalf.

### A. The city's case

### 1. J.W.'s testimony

{¶ 4} According to J.W., he was driving his Ram 5500 utility truck to work at a business on Liberty Avenue in Vermillion around 6:15 a.m. on July 14, 2023. He described the truck as "pretty big," with an 11-foot bed. He always drives his truck in the left lane so he does not "get pushed into the curb." His job involves pouring concrete and excavation.

{¶ 5} That morning, J.W. was driving in the left lane of Liberty Avenue. As he approached a bridge, he saw a red Audi in the left lane. He identified Szafranski as the Audi's driver. Szafranski moved into the right lane as J.W. approached, and J.W. drove past the car. As he was passing the car, he "seen wiper fluid, like an excessive amount of wiper fluid coming off of [the car]." The wiper fluid did not hit J.W.'s truck. When J.W.

2.

was in front of the McDonald's restaurant on Liberty Avenue, he saw the red Audi pass him on the right and "[a]s soon as he passed [J.W.], he cut [J.W.] off to the left, and then turned immediately right into the parking lot" of a shopping center. When the Audi pulled in front of him, J.W. "slammed on [his] brakes and had to go into oncoming traffic." There were no cars traveling in the opposite direction on Liberty Avenue. J.W.'s coffee spilled, and his paperwork fell on the floor.

{¶ 6} After the Audi cut him off and turned into the parking lot, J.W. was "mad" and "pretty upset" because "[e]verything was everywhere . . . and [J.W.] didn't know why he did it." J.W. "held onto [his] horn and followed [Szafranski] all the way into the parking lot until he parked" because he was "angry" and "wanted to know why he did it." J.W. stopped his truck in the "drive lane" (i.e., not in a parking spot), about six feet behind the Audi. There was a car parked to the right of the Audi and two cars parked opposite it, but J.W. did not think that a car was parked in front of it. J.W.'s windows were down, but Szafranski's were not.

{¶ 7} After Szafranski parked near the gym in the shopping center, he "immediately" got out of the car and walked toward the back of the car. J.W. "proceeded to ask what his problem was, and [they] exchanged some unpleasantries . . . ." Szafranski was about three feet from J.W.'s truck at this point. J.W. could not remember exactly what they said to each other but remembered that they "just called each other names." During this 30-second exchange, he did not threaten Szafranski. After that, Szafranski "held his finger up, and he told [J.W.] to 'Hold on a minute,' that he had something for

3.

[J.W.] . . . and then walked back to his car." After Szafranski made that comment, J.W. "knew it wasn't good, so [he] was already letting off the brake . . . ." He saw Szafranski open his driver's door and reach down to pull out an object. Szafranski came toward J.W. with the object, which J.W. "knew [] was either a club or a gun or something. [He] wasn't going to stick around and find out[,]" so he "let off the brake and made the 911 call." He saw Szafranski walk into the gym while he drove around the parking lot until he "came right back to the same spot that [he] was at"—i.e., his "original spot." At this point, Szafranski came out of the gym and walked back to his car. According to J.W., Szafranski "told [him] that it was an accident . . . ." He responded, "'We'll let the cops decide.'" Both men waited in the parking lot until the police arrived. While they were waiting, Szafranski was leaning against the back of his car, and J.W. was in his truck in its "original spot."

{¶ 8} On the 911 call that the city played for the jury,[1] J.W. reports that a "guy just pulled a gun on" him and "told [him] to drive away." He also tells the operator that Szafranski "cut [him] off at the red light, 'bout fucking made [him] crash . . . ." J.W. pulled into the parking lot to see "what his problem" was, and Szafranski "pulled a gun

---

[1] The trial court admitted into evidence "[j]ust that portion" of "the video and audio that's been played" at trial. None of the six audio and video files on the unmarked flash drive included in the record is identified by an exhibit number, the city did not assign any of the files an exhibit number during the trial, and neither the attorneys nor the court referred to timestamps or otherwise indicated what "portion" of the files was played for the jury. Because it is unclear what, exactly, was admitted as evidence, we will consider only the parts of the media files that we can discern from the transcript were actually presented to the jury.

4.

on [him] and told [him] now you can drive away." When Szafranski came to get something out of his car, he "told [J.W.] it was an accident now." J.W. specifically said that he saw Szafranski's gun, which was on the driver's side floor of Szafranski's car. Later in the call, J.W. explains that they were driving on Liberty Avenue by McDonald's when he tried to pass Szafranski. Szafranski "comes flying back by" J.W. and before he turned into the parking lot, he "cut over into" J.W.'s lane "trying to fucking crash" him. J.W. pulled into the parking lot to "see what his problem was" and "he pulls a gun out and says now [J.W.] can leave, like a real tough guy."

{¶ 9} The police arrived shortly after J.W. called. He cooperated with their investigation and gave them a written statement.

{¶ 10} During J.W.'s testimony, the prosecutor asked him multiple questions about his feelings during the altercation. J.W. said that he "didn't like" seeing the gun, no one had ever pulled a gun on him before, he was "angry[,]" at first, and had "a lot of anxiety over" this incident, to the point that he "might have to go see somebody about it." He said that his anxiety was because he did not "want anything to do with any of this[,]" did not want to be in court, and did not "want any of this . . . ." He did not want Szafranski to get in trouble but wanted to make sure that he lost his concealed-carry permit because J.W. "just didn't want him to do it again." When the prosecutor specifically asked if Szafranski's actions "cause[d] you to fear for your life[,]" J.W. responded, "[a]t the moment, it made me mad, but now I just . . . have anxiety about it."

5.

{¶ 11} On cross-examination, J.W. said that he was not suffering from anxiety at the time of the altercation; he was angry when he got cut off. J.W.'s truck is so large that he cannot move much in his lane of travel because he "only [has] a couple inches on . . . either side of [his] truck before the [lane] line." He preferred to drive in the left lane because the "lanes are really tight through there . . ." and he would get "push[ed] up on the curb" in the right lane. J.W. did not think that Szafranski cutting him off was an accident because Szafranski "passed [him] on the right after [J.W.] already made a pass" and it "seemed like a really aggressive move." On the 911 call, J.W. reported that Szafranski said, "'Now you can drive away'" after showing him the gun.

{¶ 12} J.W. usually did not confront other drivers who aggrieved him while driving "[b]ut this was a really aggressive move, and [he] didn't know why. [Szafranski] was turning right but cut [him] off to the left, so [he] didn't know how [he] offended [Szafranski] or what was going on, but [he] intended to find out." By the time of trial, J.W. "wish[ed he] would have" kept driving that day instead of confronting Szafranski and "wish[ed he] wouldn't have pressed charges or any of that so [he] didn't have to be here doing this." The only reason he noticed Szafranski's wiper fluid was because "there was an excessive amount." In his written statement to the police, he did not mention the wiper fluid, say that he passed Szafranski and then Szafranski passed him, or mention that he had to swerve into the opposite lane of travel. He admitted that his words and attitude when he was talking to Szafranski were aggressive; Szafranski's words and attitude were also aggressive. Although the men were "were pretty much at the end of

the name calling . . . [,]" J.W. was "not exactly sure" when he would have stopped arguing and driven away from the situation. J.W. did not recall Szafranski saying, "'Hey, why don't we just go our separate ways and let's have this be over'" and denied responding, "'This ain't over[.]'"

## 2. Cobb's testimony

{¶ 13} Cobb, one of the officers who responded to the scene, said that the police got a call about a disturbance in the parking lot of the gym and "the caller stated to dispatch that [Szafranski] pulled a firearm on him." She recalled that there were "not many" other vehicles in the parking lot and "the cars that were there were not in the [gym] part . . ." of the lot where J.W. and Szafranski had argued. She recalled that "[t]here may have been one other vehicle, aside from [Szafranski's] and [J.W.'s] vehicle[s]" in that area.[2]

{¶ 14} When Cobb spoke to J.W., he told her that "there had been a road rage incident in which [Szafranski] was the aggressor. He followed [Szafranski] into the parking lot . . . to ask him what the basis was for the road rage incident. An argument occurred, and then [Szafranski] brandished a firearm." She "thought that [J.W.'s]

---

[2] The prosecutor used Cobb's body camera video to refresh her recollection of how many other cars were in the parking lot. The bottom one-quarter to one-third of the frame of the video that is in our record—which covers the part of the frame that shows most of the parking lot—is pixelated to the point that only colors are visible. The other areas on the screen occasionally show some parts of the parking lot, but it is difficult to determine how full the lot is. However, at one point, the tops halves of three or four vehicles are visible in front of the gym. One of those cars is directly in front of a red car that is presumably Szafranski's Audi.

7.

decision to follow Mr. Szafranski into the parking lot was inappropriate and may appear aggressive." The officers did not charge J.W. with anything related to the incident because, "[a]lthough [J.W.'s] behavior was not appropriate and escalated the situation, he did not threaten Mr. Szafranski, exit his vehicle, or brandish any kind of weapon."

{¶ 15} When Cobb spoke to Szafranski, he reported that "he was unaware of a road rage incident and that he did not purposely cut [J.W.] off, but that [J.W.] had followed him into the parking lot and began an argument with him. He thought that [J.W.] may get out of the car and that he might need to display his firearm." After discussing the situation, Cobb and Sargent determined that "a charge of menacing was appropriate for displaying the firearm."

### 3. Cobb's body camera video

{¶ 16} The city played Cobb's body camera video for the jury. In the video, J.W. is telling Sargent what happened as Cobb approaches them. J.W.'s words become clearly audible as he is telling Sargent that he pulled into the parking lot and asked Szafranski "what the fuck's your problem?" In response, Szafranski pulled a gun from his car and said, "wait a minute. I've got something for you." After pulling his gun out, Szafranski said, "now you can fucking drive away." J.W. responded "fuck you" and called the police. When Sargent asks J.W. to describe the gun, he says that it was "black." He is not able to provide any further description but agrees with Sargent when he asks if it was a handgun. J.W. also tells Sargent that "this guy's a fucking asshole."

8.

{¶ 17} When Sargent walks away to talk to Szafranski, Cobb asks J.W. what happened. He reports that he was driving at 35 m.p.h. when he approached Szafranski, who was going 25 m.p.h. Szafranski got into the right lane, and J.W. passed him on the left. As J.W. was driving by, Szafranski "starts spraying his wiper fluid out at [J.W.] like a two-year-old" and sprayed the wiper fluid "for an excessive amount of time as [J.W.] was passing." J.W. thought that Szafranski was "trying to get [J.W.'s] windshield wet . . . ." After J.W. was "completely by" Szafranski, Szafranski "come[s] flying back around" him at 50 m.p.h., and right before they turned into the parking lot, Szafranski "went left and pushed [J.W.] into the other lane." J.W. "hit the brakes so hard that [he] was completely stopped . . . ." J.W. pulled into the parking lot to "see what his problem was," and Szafranski "pulled his gun" on him like "a big tough guy." J.W. did not get out of his truck; he just "wanted to see what [Szafranski's] fucking problem was."

{¶ 18} Later in the video, Cobb asks J.W. if he is "all right." J.W. says that he is and adds something about a "piece of shit." Cobb also asks if he is "calming down." J.W. says that he is "on [his] way down." When Cobb says that she would be "freaked out" if someone pulled a gun on her, J.W. responds, "I wanted to take it from him[.]" J.W. did not say at any point in the video that he was scared, afraid, concerned for his safety, or anything similar.

{¶ 19} Cobb also speaks to Szafranski while he is sitting in Sargent's patrol car. He tells her that he passed J.W. in a "small" lane before getting to the gym parking lot. As he was pulling into the parking lot, he "probably swung out a bit" and "didn't know

9.

where [J.W.] was necessarily." Once he was in the parking lot, J.W. was "cutting him off," "beeping his horn" and "trying to pass" him. He described J.W. as "mad."

{¶ 20} After Szafranski parked, he saw J.W. sitting there, and J.W. was "squawking at" him. After briefly sitting in his car, he got out to go into the gym. He says that it "look[ed] like [J.W.] was getting out of his car to address [Szafranski]." In response, Szafranski said, "hey, I just want to show you something" and got his gun from under his seat. The gun was in its holster, and he kept it pointed down, never raised it, and did not have his finger on the trigger. He got the gun because "it look[ed] like he's getting out of his car and it look[ed] like [Szafranski] was going to have to defend [him]self." After that, J.W. talked a little bit more, and then Szafranski put the gun back in the car and walked into the gym.

{¶ 21} When Szafranski got to the gym door, he realized that he had forgotten his phone and towel and went back to the car, on the passenger side, to get them. J.W. was still sitting there "squawking at" Szafranski and talking on the phone. When J.W. told Szafranski that he was going to call the police, Szafranski came back, sat on the back of his car, and waited. He did not go toward J.W.'s car, engage with J.W. physically, call J.W. names, or "escalate or anything." He told J.W. that "it was an accident," but "[J.W.] wasn't going to have that."

{¶ 22} Szafranski reiterates that he grabbed his gun when he "thought that [J.W.] was getting out of his car to come after [him,]" but Szafranski "never came at him with it or anything." Instead, he showed J.W. the gun, put it back in his car, and went into the

10.

gym. He says that he was "leaving the scene" and J.W. was "the one who was staying." He also reiterates that "if [he] did cut [J.W.] off, it was an accident," J.W. "came in the parking lot after" him, and he did not know that J.W. was near him until J.W. tried to pass him by McDonald's and was "beeping his horn at" him. Szafranski said that "look[ed] very aggressive to [him]." He explains that J.W. "drove around" by the time police arrived and was initially "way closer to" and "right behind" his car.

### 4. Sargent's testimony

{¶ 23} Sargent, the first officer to arrive on the scene, said that he "was advised by 911 that we received a call of a road rage incident that ended at the [gym] . . . . During that time, a firearm was brandished at one of the subjects involved." When Sargent got to the parking lot, Szafranski was leaning against the trunk of his car with his hands displayed. Sargent did not see a firearm. He asked Szafranski about the gun, patted him down, and put him in the squad car.

{¶ 24} After separating the men, Sargent talked to J.W. He reported that he was traveling in the left lane when he came up on the red Audi. The Audi got into the right lane and was driving at "a slow speed." When J.W. passed the car, "he observed an excessive amount of windshield washer fluid coming off of the red Audi." Near McDonald's, J.W. "observed the red Audi come flying up behind him at a high rate of speed in the right-hand lane." Then, the car moved into his lane and cut him off, which "forced him to slam on his brakes, and swerve into the oncoming lane of travel . . . ." He saw the car pull into the parking lot and followed it. J.W. reported that he "confronted"

the driver and "both of them exchanged words . . . there was profanity they were yelling at each other back and forth." Szafranski then told J.W., "'I have something for you,' went back to his vehicle . . . and retrieved a firearm from the vehicle." J.W. reported that he had not made any threats to Szafranski. Sargent described J.W. as "upset about the situation, about having a firearm pulled on him" and said that J.W.'s demeanor was "pretty typical" of other people he had seen in similar situations. After someone has been threatened and had a firearm pulled on them, they "tend to bounce around emotionally."

{¶ 25} When Sargent spoke to Szafranski, he reported that he might have gone "a little bit into [J.W.'s] lane, stated that if he did it was an accident and it wasn't intentional." J.W. confronted him after he pulled into the parking lot. He admitted that they "exchange[d] words back and forth with each other." During the argument, Szafranski went back to his car to get his gun because "he was not sure what [J.W.] was going to do . . . ." J.W. did not threaten Szafranski.

{¶ 26} Based on his investigation, Sargent arrested Szafranski and charged him with aggravated menacing. He ultimately filed a reduced charge of menacing, which he thought was appropriate because J.W. did not leave his truck or make any physical threats, so "there was no reason to ever pull the firearm[,]" and there is an "implied threat of serious physical harm" when a person pulls a gun on someone. He did not charge J.W. because "[p]ulling into a parking lot to have a conversation does not fall under any ORC statute."

12.

{¶ 27} Sargent was wearing a body camera that day but discovered when he reviewed the video that "a lot of the initial conversation was not on audio" because the camera's mute feature was somehow activated.

{¶ 28} After Sargent took Szafranski to the police station, Szafranski made some phone calls while sitting in the booking room, which were recorded on video. Sargent recalled that Szafranski told the person he called that someone pulled in behind him, not right behind him, which was consistent with what Szafranski reported at the scene.

{¶ 29} The city played one of the booking room calls for the jury. The details of the incident that Szafranski recounts during the phone call are consistent with the details he gave Cobb at the scene. Additionally, Szafranski says (1) J.W. was honking his horn and flashing his lights when they were by McDonald's; (2) J.W. "pull[ed] in behind me, kinda close but not like right behind me, but behind me"; (3) later in the call that J.W. "park[ed] right behind" him; (4) he "took out" his gun for "two seconds"; (5) he was "tired" because he got home from the airport late the night before; (6) he had canceled a physical therapy appointment for his "sore" neck that was scheduled for later that morning; (7) he waited for the police at his car because J.W. had followed him into the parking lot and he believed that he "did nothing wrong"; and (8) he responded to J.W. saying "fuck you" with "fuck you. It was an accident. Let's just move on."

{¶ 30} On cross, Sargent said that he was not sure how his body camera was put on mute, but he did not turn on the mute feature. J.W. was annoyed by Szafranski spraying washer fluid. He confirmed that Szafranski did not verbally threaten J.W.

13.

{¶ 31} Following Sargent's testimony, the city rested.  Szafranski moved for acquittal under Crim.R. 29 because the city failed to present any evidence that Szafranski caused J.W. to believe that he would cause physical harm to J.W. or his property.  He argued that J.W. testified that he was mad, but never said that he was afraid, and staying at the scene after Szafranski showed the gun demonstrated that he was not afraid.  The city responded that Sargent testified about J.W.'s demeanor, Cobb asking J.W. if he was "'coming down[]' suggest[ed] that he was upset[,]" and J.W. "drove a little bit away" from Szafranski to call 911.  It also argued that "a gun was pulled out after a verbal interaction, and that constituted enough to show that Mr. Szafranski intended to cause [J.W.] to believe that physical harm would result to him."  The trial court denied Szafranski's motion because "reasonable minds can reach different conclusions as to whether each and every material element of the crime has been proved beyond a reasonable doubt . . . ."

### B. Szafranski's case

{¶ 32} In his testimony, Szafranski said that he was an army veteran who had extensive training in handling weapons.  He also had his concealed-carry license for his personal safety because he was at his office about 15 years earlier when two people tried to rob it.  Since then, he "[a]lmost always" carries a gun with him in his car.

{¶ 33} On July 14, Szafranski was driving from his house to the gym at about 6:30 a.m.  He did not remember if he cleaned his windshield on the way to the gym that morning.  He first noticed J.W.'s truck after he crossed the bridge on Liberty Avenue.  He

14.

was gaining on the truck, despite having his cruise control set at 26 m.p.h. Liberty Avenue goes from one lane to two lanes after the bridge; Szafranski moved into the right lane once the road widened. As he got closer to the gym parking lot, Szafranski saw J.W.'s truck again. It was in the left lane going very slowly. Szafranski "thought [J.W.] was turning left, so [he] just went past him on the right, and it was completely innocuous." He did not think that he had made a wide turn and entered J.W.'s lane. Instead, he said that the road is very narrow in that area, and he thought that "the lanes are so narrow there that it can appear that cars are closer than what they actually are . . . ."

{¶ 34} Szafranski first noticed that J.W. had an issue with him as he was driving through the gym's parking lot. J.W.'s "truck pulled up right next to [Szafranski], and he was getting very close. [Szafranski] had to move out of his way to avoid being contacted by his truck." J.W.'s actions "took [him] totally by surprise" and "shocked," "startled," and "scared" him. J.W. was "beeping his horn and [] saying something to . . ." Szafranski. This went on for "a couple hundred feet." According to Szafranski, "[a]t this point [he] still d[id]n't know what he's doing. [Szafranski] wasn't even aware that [J.W.] was behind [him] on the road."

{¶ 35} After that, Szafranski parked his car so he could go into the gym. There was a car parked directly in front of him. When he got out of his car, J.W. "pulled his truck up right behind [Szafranski's] car." Szafranski said that this was "scary" because he was injured and had "nowhere to go."

15.

**{¶ 36}** Once Szafranski was out of his car, J.W. started yelling at him "[a]nd it's profanity laced, and it's angry. He's really angry with [Szafranski] at this point" and was "threatening" him. He "still d[id]n't realize what's going on, but [was] starting to pick up on the fact that when [J.W.] was alongside of [him] by McDonald's he was being aggressive with [Szafranski]. He was trying to hit [Szafranski's] car." Szafranski was "getting scared" because J.W. had pulled his truck "within a couple of feet" of his car and he was blocked into the parking spot and "had nowhere to go"; he could not have moved his car without hitting either J.W.'s truck or the car parked in front of him. Szafranski did not want to walk in front of J.W.'s truck because he realized that J.W. was trying to hit him as they drove by McDonald's and Szafranski "can't run because it's a wide-open parking lot. [J.W.] could just run [him] right over."

**{¶ 37}** While Szafranski was out of his car, "[t]here were words exchanged. [J.W.] started off . . . swearing at [Szafranski], saying [Szafranski] cut him off, and he was calling [Szafranski] names." Szafranski admitted that his "first response was less than stellar, but after that . . . [he] wanted [J.W.] to leave . . . ." He "could see that this situation was getting out of control . . ." and attempted to deescalate the confrontation by saying, "'Look, I don't think that I cut you off, but if I did it was an accident.'" However, J.W. "was just getting more and more angry" and "wasn't satisfied with, 'Look, if I cut you off, it was an accident. I apologize.'" After that, Szafranski tried to deescalate the situation by saying, "'It's over. Let's go on with our day. Let's move

16.

on.'" J.W. responded by twice saying "'It's not over, it's not over,' and then he put his truck in park."

{¶ 38} When J.W. put his truck into park, Szafranski thought that he was going to get out of the truck and was "afraid for [his] safety." He was concerned because he could not see J.W.'s hands and did not know if he had a gun or a hammer and "thought [he] was about to get injured or hit over the head with a tool." Szafranski then said something to the effect of "'It is over, and this is why,' . . . 'Let me show you why it's over[,]'" or "'Let's go on with our day, let's move on, it's over'" and went back to his car to get his gun and show it to J.W. His gun was holstered, pointed down, and "out for probably three seconds." He put the gun away immediately after displaying it and said he "didn't want to use [his] gun."

{¶ 39} Before displaying his gun, Szafranski was "terrified for [his] safety . . . " and "100 percent sure [J.W.] was coming out of that truck." J.W. did not calm down at any point in the altercation. Szafranski got the gun "to de-escalate one last time" because his earlier attempts to deescalate the situation were not successful. Although he was in good physical condition and thought that he normally could have "handled [him]self in a fight[,]" he had a neck and shoulder injury that prevented him from moving his arm normally, and he "d[id]n't think that [he] could have defended [him]self physically that day because of this neck and shoulder injury that [he] had that was very painful . . . ." Szafranski "was just trying to get [J.W.] to get his head on his shoulders and leave so that

[he] could go on with [his] day.  And nothing was calming [J.W.] down, and [he] just wanted the situation to de-escalate."

{¶ 40} After Szafranski showed his gun, J.W. said that he was calling the police and moved his truck "not very far, just like on the other side of the cars that were parked against [Szafranski's]."  Szafranski went into the gym because he wanted to get away from J.W.  He came back to the car soon after because he forgot his phone and towel.  He got those items from the passenger door "so that there was no mistaking that [he] wasn't going back for [his] weapon."  He decided to stay at his car because he did not want the police to come into the gym to get him.  J.W. moved his truck farther away from Szafranski's car when Szafranski returned from the gym.

{¶ 41} On cross, Szafranski testified that he did not want to use his gun when he took it out of his car but was displaying it only to deescalate the situation.  His gun "never came out of the holster, it never raised up, and was out for three seconds."  He denied using the gun to threaten J.W. and disagreed with the prosecutor's assessment that "showing [his] weapon actually escalated the situation . . . ."  Szafranski did not tell the police or the person he was talking to in the booking room that he was afraid J.W. was going to use a tool or weapon against him, but "it was definitely on [his] mind as [they] were standing there and [J.W.] was threatening [him]."  He said that J.W. "threatened" him by trying to hit his car as they drove by McDonald's.  He interpreted J.W. blocking his car and telling him "'it's not over'" when he tried to deescalate as a "threat to [his] personal safety."  He admitted that Cobb's body camera video did not show him telling

18.

her about J.W. saying it was not over. Nor did he tell her about his neck and shoulder injury or J.W. trying to hit his car by McDonald's. He told Cobb that J.W. drove beside him and tried to pass him. He claimed that he "was in shock at this point." His trial testimony was the first time he told anyone about J.W. trying to hit his car.

{¶ 42} The prosecutor had Szafranski recount the order of events from that morning again. He first saw J.W.'s truck when it pulled alongside him by McDonald's. He did not see the truck as he was parking near the gym, but noticed it parked close behind him when he got out of his car. J.W. had his window down and was saying "[m]ean things" to Szafranski because he was upset about something that had happened, but Szafranski did not know what he was upset about. At some point, J.W. said that Szafranski had cut him off. Szafranski then "de-escalated" the situation by saying, "'I don't think that I cut you off, but if I did I apologize. It was an accident.'" At this point, he had not yelled or sworn at J.W. He again tried to deescalate the situation by saying, "'It's over. Let's go on with our day. Let's move on.' Not in that particular order, but those are the three things that I said to him." When that did not work, he walked to his driver's door quickly "because that's when [J.W.] had put his truck in park, and [Szafranski] thought he was getting out." He did not remember if he turned away from J.W. or walked backwards to the door.

{¶ 43} Once he got to the door, his back was not turned toward J.W.; he explained that this was possible because of the angle of the parking spaces and the location of J.W.'s truck. He opened the door, reached in to grab his holstered gun, which was

19.

partially under the driver's seat, pulled it out, and showed it to J.W.[3] The gun "never came up . . . never pointed . . . [and] never came out of the holster." He intended to show J.W. the gun "because [he] thought [J.W.] was getting out of his car[,]" but did not intend to use the gun if J.W. got out of the truck. Szafranski denied threatening J.W. with the gun. He claimed that he showed the gun to "de-escalate[]" J.W. and "the gun came out and went back so fast, [he] was trying to get [J.W.] to stop this escalation that he was involved in." Szafranski admitted that J.W. never got out of his truck but said that "[h]e didn't because [Szafranski] de-escalated."

{¶ 44} Following his testimony, Szafranski rested.

{¶ 45} The jury found Szafranski guilty. The trial court sentenced him to 30 days in jail, all suspended, placed him on probation, and ordered that the gun involved in this incident be destroyed.

{¶ 46} Szafranski now appeals, raising four assignments of error:

> Appellant's First Assignment of Error:

> Szafranski's conviction for menacing under R.C. 2903.22 was not supported by sufficient evidence because the City failed to produce evidence that J.W., the alleged victim, believed Szafranski would cause him physical harm, a necessary element of menacing.

---

[3] Szafranski demonstrated for the jury how he removed and displayed his gun, but it is unclear from the transcript exactly what he did during his demonstration.

20.

Appellant's Second Assignment of Error:

The Trial Court's convicting Szafranski of menacing under R.C. 2903.22 was contrary to the manifest weight of evidence because the City failed to produce any evidence that J.W., the alleged victim, believed Szafranski would cause him physical harm, a necessary element of menacing.

Appellant's Third Assignment of Error:

The Trial Court erred as a matter of law by not permitting a self-defense jury instruction, even though Appellant Szafranski produced evidence supporting that he showed a holstered pistol only to defend himself against the alleged victim's aggression and threats, and the City failed to prove otherwise beyond a reasonable doubt.

Appellant's Fourth Assignment of Error:

Trial counsel was ineffective by failing to present sufficient evidence that tended to support that the Szafranski used force in self-defense from fear of death or serious bodily injury.

## II. Law and Analysis

### A. Szafranski's conviction is not supported by sufficient evidence.

{¶ 47} In Szafranski's first assignment of error, he argues that his conviction is not supported by sufficient evidence because the city failed to present evidence that J.W. believed that Szafranski would cause him physical harm. He points out that he did not

verbally threaten J.W. or "brandish[] his pisto[l] in even a slightly threatening way, . . ." and the city "pressed J.W. no less than eight times to say he feared for his safety and, each time, J.W. declined."

{¶ 48} The city responds that Szafranski's "conscious decision to retrieve a firearm and show J.W. that he had possession of [it]" demonstrates that "Szafranski had one goal in retrieving his firearm; that [was] to cause J.W. to believe that he would cause him physical harm." It also implies that J.W.'s decision to call the police indicates that he thought Szafranski was going to cause him physical harm.

{¶ 49} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). We do not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 2008-Ohio-2762, ¶ 132. "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.* Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 50} Szafranski was convicted of menacing under R.C. 2903.22(A)(1), which, as relevant here, required the city to prove that Szafranski knowingly caused J.W. to believe that he would cause physical harm to J.W. As part of proving the elements of menacing,

22.

the prosecution must show that the victim *subjectively believed* that there was a possibility of physical harm. *State v. McConnaughey*, 2021-Ohio-3320, ¶ 41 (1st Dist.), citing *State v. Lampela*, 2016-Ohio-8007, ¶ 19 (6th Dist.); and *State v. Cox*, 2016-Ohio-3250, ¶ 22 (5th Dist.). "Physical harm" is "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). "'Menacing can be implied by the offender's actions without a verbal threat, and under ordinary circumstances *[t]he key is whether the victim genuinely believes that he or she is facing physical harm* to person or property.'" (Emphasis added and brackets in original.) *State v. Harvey*, 2023-Ohio-4454, ¶ 29 (6th Dist.), quoting *State v. Whitehead*, 2019-Ohio-5141, ¶ 24 (2d Dist.); *State v. Myers*, 2008-Ohio-1913, ¶ 14 (9th Dist.).

{¶ 51} Here, the city presented absolutely no evidence that J.W. subjectively believed that Szafranski was going to harm him. J.W. testified that he was "upset," "mad," and "angry" at the time, and had "anxiety" after the fact, but he did not say that he was scared, afraid, fearful, concerned for his safety, thought that Szafranski was going to shoot him, or anything else that could be construed as an indication that he feared physical harm from Szafranski. *Compare State v. Intihar*, 2015-Ohio-5507, ¶ 12-15 (12th Dist.) (defendant's act of brandishing a gun "merely as a 'deterrent'" while "looking over at [victim] angrily" during a road-rage incident was sufficient to support defendant's menacing conviction where victim testified that he was "scared").

{¶ 52} Nothing on Cobb's body camera video indicated that J.W. thought he was in danger of physical harm. J.W. did not mention fear, harm, or safety while talking to

23.

her, even when she asked if he was "all right" and "calming down." His response when Cobb said that she would be "freaked out" if someone pulled a gun on her was saying that he "wanted to take it from" Szafranski—not that he had concerns about physical harm. J.W. was clearly angry and agitated, but there is no evidence in the video that he thought Szafranski was going to physically hurt him. He was not crying or shaking, did not appear afraid, and did not drive away from where Szafranski was parked. In fact, he testified that he moved his truck away from Szafranski's car to call 911 but drove it around the parking lot until he came back to the "same spot"—i.e., his "original spot." *See Garfield Hts. v. Greer*, 2006-Ohio-5936, ¶ 9 (8th Dist.) ("[R]etreat from a threatening situation can be circumstantial evidence of a belief that the offender will cause serious physical harm to the person.").

{¶ 53} Finally, Sargent's testimony that J.W. was "upset about the situation, about having a firearm pulled on him" and had a demeanor that was "pretty typical" of other people who had firearms pulled on them, which amounted to "tend[ing] to bounce around emotionally," did not address whether J.W. feared physical harm from Szafranski. Being upset—standing alone—does not tell us that J.W.'s concerns were related to his belief that Szafranski would cause him physical harm. And Sargent did not elaborate on what emotions would "bounce around" for a "pretty typical" victim in that situation—i.e., "pretty typical" and "bounce around emotionally" do not tell us about a victim's thoughts, feelings, or behaviors—so Sargent's assessment cannot be used to show that J.W. believed that Szafranski was going to physically harm him.

24.

{¶ 54} Showing a gun can undoubtedly be a threat sufficient to support a menacing conviction. *See State v. El-Hardan*, 2011-Ohio-4453, ¶ 43 (2d Dist.) ("merely displaying a [gun] is enough to support a conviction for Aggravated Menacing [under R.C. 2903.21] *when this act causes the victim to believe that the defendant will cause him serious physical harm.*" (Emphasis added.)). But to prove menacing under R.C. 2903.22(A)(1), the prosecution must *also* show that a threat caused the victim to *actually believe* that he was at risk of physical harm. *McConnaughey* at ¶ 41. The city's arguments and the cases it cites under this assignment of error relate to whether Szafranski's actions constituted a threat; they do not address J.W.'s belief that Szafranski would cause him physical harm, the element that Szafranski is challenging in this appeal. The record in this case simply does not show that J.W. had a subjective belief that Szafranski was going to cause him physical harm. Because the city failed to prove this element of the offense, Szafranski's conviction is not supported by sufficient evidence. Therefore, Szafranski's first assignment of error is well-taken.

**B. Szafranski's remaining assignments of error are moot.**

{¶ 55} Our reversal of Szafranski's conviction for insufficient evidence moots his remaining assignments of error. Consequently, Szafranski's second, third, and fourth assignments of error are not well-taken.

25.

### III. Conclusion

**{¶ 56}** For the foregoing reasons, the March 19, 2024 judgment of the Vermillion Municipal Court is reversed and vacated. The city is ordered to pay the costs of this appeal under App.R. 24.

Judgment reversed
and vacated.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Christine E. Mayle, J.

Charles E. Sulek, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.